FILED
CLERK
1/15/2016 4:01 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

JOHN T. PASKINS,

                               Plaintiff,

         -against-

CAROLYN COLVIN, Acting Commissioner
of Social Security,

                             Defendant.

----------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
14-cv-4098(ADS)

## APPEARANCES

**Christopher J. Bowes, Esq.**
*Attorney for the Plaintiff*
54 Cobblestone Drive
Shoreham, NY 11786

**United States Attorney's Office, Eastern District of New York**
*Attorneys for the Defendant*
271 Cadman Plaza East
Brooklyn, NY 11201
       By:    Gail A. Matthews, Assistant United States Attorney

**SPATT, District Judge:**

On July 2, 2014, the Plaintiff John T. Paskins (the "Plaintiff" or "Paskins")
commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405 *et seq.*,
challenging a final determination by the Defendant Acting Commissioner of Social
Security Carolyn Colvin (the "Defendant" or "Commissioner"), that he is ineligible
to receive Social Security disability insurance benefits.

Presently before the Court are the parties' cross-motions, pursuant to Federal
Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c), for judgment on the pleadings.

For the reasons that follow, both motions are granted in part and denied in part, and this matter is remanded for further administrative proceedings consistent with this opinion.

## I. Background

The Plaintiff, 52, is a retired Sergeant in the New York City Police Department. After completing two years of college, he served on the police force for twenty-one years, from January 1986 to February 2007. In that capacity, he worked as a First Responder immediately following the terrorist attacks on the World Trade Center in September 2001.

Following his retirement from the NYPD in 2007, Paskins worked part-time as a security guard, until June 2010, when he allegedly became disabled.

On January 18, 2011, the Plaintiff filed an application for Social Security disability insurance benefits, alleging a disability onset date of June 30, 2010. In this regard, the Plaintiff alleges to have suffered from the following disabling conditions and/or impairments as of that date: asthma; gastroesophageal reflux disease, also known as acid reflux; restrictive airway disease; bronchitis; neck, back, and shoulder pain; functional loss; and fatigue.

Further, it is undisputed that last date on which the Plaintiff was insured, and therefore within the purview of Title II of the Social Security Act, was December 31, 2012. Thus, in this action, the period of time for which he is seeking benefits runs from June 30, 2010 to December 31, 2012 (the "Relevant Time Period").

The medical evidence in the Record is largely undisputed. However, of particular relevance to this appeal are the reports of two treating physicians, namely, Dr. Paul Schulster, a pulmonologist, and Dr. Mitchell Goldstein, an orthopedist. The Court will address the evidence relating to these treating sources in further detail.

## A.   The Medical Evidence Relating to Treating Source Dr. Paul Schulster

The record reflects that the Plaintiff was treated by Dr. Schulster from June 2011 through December 2012.

Before turning to the substance of Dr. Schulster's treatment records, the Court finds that it will be helpful to identify certain clinical terms and measurements that are relevant to understanding those records. For example, the Plaintiff in this case underwent spirometry testing in connection with his alleged respiratory impairment. As one district court has instructively noted:

> Spirometry is an objective form of pulmonary function testing. Two particular measurements are important: one-second forced expiratory volume (FEV1) and forced vital capacity (FVC). A person's reported FEV1 and FVC are gauged in relation to the predicted normal value of each measure for an individual. The predicted normal value for each person is a fixed value based off of a person's height.

Wilson v. Colvin, 14-cv-9207, 2015 U.S. Dist. LEXIS 71214, at *43-*44 (S.D.N.Y. June 2, 2015) (internal quotation marks and citations omitted).

FVC, or "forced vital capacity," is more precisely defined as " 'the volume of air expired with maximum force.' " Barkley v. Barnhart, 250 F. Supp. 2d 271, 276 n.4 (W.D.N.Y. 2003) (quoting Mark H. Beers, M.D. & Robert Berkow, M.D., THE

MERC MANUAL OF DIAGNOSIS AND THERAPY, p. 521-22 (1999)). FEV1, or "forced expiratory volume in one second, in liters," Barkley, 250 F. Supp. 2d at 276 n.4, measures the volume of air that an individual can "forcibly expire in one second after maximum inspiration," Torres v. Astrue, 11-cv-5260, 2013 U.S. Dist. LEXIS 31080, at *7-*8 (E.D.N.Y. Mar. 5, 2013).

Certain respiratory impairments are treated using a bronchodilator, that is, "a medication that relaxes the bronchial muscles and thus expands the air passages of the bronchi." Sea "B" Mining v. Dunford, 188 F. App'x 191, 200 n.11 (4th Cir. 2006); see STEDMAN'S MEDICAL DICTIONARY 251 (27th ed. 2000) (defining a bronchodilator as an agent that possesses the power to increase the caliber of a bronchial tube).

With this medical information in hand, the Court will turn to the substance of Dr. Schulster's treatment records.

At the outset, the Court finds that Dr. Shulster's handwritten treatment notes are wholly illegible. Thus, although the Plaintiff offers interpretations of portions of these records, the Court is unable to verify their accuracy. Unless otherwise noted, for purposes of this discussion, the Court is relying primarily on type-written reports generated by Dr. Schulster's medical office and the printed results of spirometry tests administered by him.

Results from such testing on June 20, 2011 indicate that Paskins had an FVC of 3.04 liters, which was 59 percent of the predicted capacity for a man of his height, namely, 5 feet 11 inches tall. After using a bronchodilator, his capacity increased to

3.62 liters, or 70 percent of the predicted value. Further, the Plaintiff had an FEV1 of 2.11 liters, which was 51 percent of the predicted capacity. This number rose to 2.58 liters, or 63 percent of the predicted value, after using a bronchodilator.

Results of similar tests conducted on August 23, 2011 indicate a pre-bronchodilator FVC that was 46 percent of predicted, which increased to 63 percent post-bronchodilator; and a pre-bronchodilator FEV1 that was 41 percent of predicted, which increased to 60 percent post-bronchodilator.

Additional tests performed on August 23, 2011, indicated a pre-bronchodilator FVC that was 45 percent of predicted, which increased to 50 post-bronchodilator; and a pre-bronchodilator FEV1 that was 40 percent of predicted, which increased to 46 percent post-bronchodilator.

A legible portion of Dr. Schulster's handwritten notes from a December 6, 2011 visit with the Plaintiff indicate that he reported "not doing well." However, the results of spirometry tests performed on that date reflect improved pulmonary function. In particular, laboratory records show a pre-bronchodilator FVC that was 58 percent of predicted, and a pre-bronchodilator FEV1 that was 51 percent of predicted. Both figures did not increase with use of a bronchodilator.

On January 3, 2012, Dr. Schulster generated a type-written report indicating that Paskins was in no acute distress, but had complained of chest pain and discomfort; chest congestion; coughing up sputum; and wheezing. The Court notes that "sputum" is a term used to describe certain "matter, especially mucus" which is "expectorated" – that is, coughed up or spit out – "in diseases of the air passages."

See STEDMAN'S at 1681-82. Further, Dr. Schulster noted that Paskins had been taking medications, including solumedrol and prednisone, both steroids, as prescribed.

An examination of the Plaintiff's lungs revealed a cough that he described as paroxysmal, namely, the type that comes on suddenly and severely. See id. at 1318. In addition, Dr. Schulster observed abnormal breath and/or voice sounds; wheezing; and rhonchi. "Rhonchi" are specific sounds created by the passage of air through bronchial tubes that are narrowed by inflammation, mucus, or other similar conditions. See id. at 1568.

The doctor noted that the results of spirometry tests showed a moderately obstructed airway, although with slight improvement when using a bronchodilator. More particularly, the results of the Plaintiff's spirometry tests showed a pre-bronchodilator FVC that was 51 percent of predicted, which increased modestly to 52 percent post-bronchodilator; and a pre-bronchodilator FEV1 that was 46 percent of predicted, which increased to 49 percent post-bronchodilator.

On February 6, 2012, Dr. Schulster generated another type-written report, which noted that Paskins was "[f]eeling as well as can be expected" and that, although the prescribed steroids improved his condition, he still felt mild chest congestion and had been mildly wheezing and coughing up clear sputum. Again, an examination of the Plaintiff's lungs revealed abnormal breath and/or voice sounds and mild wheezing. However, Dr. Schulster noted that he did not hear rhonchi and that the results of Paskins' most recent spirometry tests were "much improved."

On April 12, 2012, Paskins visited Dr. Schulster for another "routine follow up." On this date, the Plaintiff reported feeling "terrible," "bad," and "weak." Apparently, he had been coughing up clear sputum, wheezing, and experiencing mild dyspnea – that is, shortness of breath and/or difficulty breathing. See STEDMAN'S at 556.

An examination of the Plaintiff's lungs revealed a paroxysmal cough; abnormal breath and/or voice sounds; and diffuse wheezing. Dr. Schulster noted that there had been no positive change in the results of spirometry testing, which showed a pre-bronchodilator FVC that was 54 percent of predicted, and a pre-bronchodilator FEV1 that was 51 percent of predicted. These figures did not increase with use of a bronchodilator.

The Plaintiff again followed up with Dr. Schulster on May 22, 2012, and again, reported feeling "terrible." According to a type-written report, Paskins complained of labored breathing; chest congestion; wheezing; and coughing up clear sputum. An examination of the Plaintiff's lungs revealed abnormal breath and/or voice sounds and moderate diffuse wheezing. Dr. Schulster again noted a moderately obstructed airway, but stated that Paskins' pulmonary function improved with the use of a bronchodilator.

Dr. Schulster's assessment from this visit included: (i) asthmatic bronchitis, namely, an "[i]nflammation of the mucous membrane of the bronchial tubes," which causes bronchospasms, or "[c]ontraction[s] of smooth muscle in the walls of the bronchi," STEDMAN'S at 250-52; (ii) asthma, namely, a term to describe "[a]n

inflammatory disease of the lungs characterized by reversible (in most cases) airway obstruction," which is also "used to denote bronchial reactive airway disease," id. at 158; and (iii) status asthmaticus, "a condition of severe prolonged asthma," id. at 1663.

The results of testing conducted on May 22, 2012 showed a pre-bronchodilator FVC that was 49 percent of predicted, and a pre-bronchodilator FEV1 that was 43 percent of predicted. The former figure showed no improvement with the use of a bronchodilator, but the latter increased to 48 percent of predicted.

The Plaintiff's next visit with Dr. Schulster occurred on July 3, 2012, during which he complained of mild wheezing and a sore throat. However, Dr. Schulster's examination of Paskins' pharynx – that is, the portion of the digestive tube between the esophagus below the mouth, and nasal cavities above and in front, see STEDMAN'S at 1361 – was normal. Further, the doctor did not observe any wheezing or rhonchi in the lungs, and reported normal breath and/or voice sounds. Results of spirometry testing performed on that date showed markedly improved pulmonary function. In particular, the Plaintiff had a pre-bronchodilator FVC that was 77 percent of predicted, and a pre-bronchodilator FEV1 that was 74 percent of predicted.

On September 25, 2012, the Plaintiff reported to Dr. Schulster that he was "feeling as well as can be expected," despite mild wheezing. An examination of his lungs was unremarkable and revealed no abnormal sounds, wheezing, or rhonchi.

Spirometry tests continued to show a moderately obstructed airway, which was improved by using a bronchodilator.

The Plaintiff returned to Dr. Schulster on November 28, 2012 for another routine follow up and, again, indicated that he felt well, despite experiencing labored breathing, wheezing, and chest congestion. On this date, Dr. Schulster's examination of Paskins' lungs revealed that abnormal breath and/or voice sounds had returned, as had mild diffuse wheezing. His assessment included dyspnea, asthma, and chronic obstructive asthma, and he noted that there had been no positive change in the Plaintiff's spirometry test results.

Of particular relevance here, on December 19, 2012, Dr. Schulster wrote an opinion letter, which noted that he had been treating the Plaintiff since June 20, 2011 for "Reactive Airway Disease/Asthma," which conditions had "been confirmed by clinical examination as well as numerous testing including pulmonary function testing with bronchodilator." Dr. Schulster noted that the Plaintiff was, at that time, being treated with Dulera, Nasonex, Proair, Veramyst, Nexium, Budesonide, and Performist.

Based on his clinical observations, Dr. Schulster opined that:

[The Plaintiff's] severe pulmonary condition precludes the performance of any work. These symptoms will likely increase with any sustained exertion (even light) as well as temperature changes, humidity changes, dust, fumes, chemicals, perfume, animals, stress and many other precipitating factors. Clearly this patient would not be capable of performing any job requiring him to be on his feet for much of the day, to lift more than a few pounds on a sustained basis, to work outside or near any dust or caustic chemicals. Mr. Paskins [*sic*] condition, although stable at times has not improved since the World

9

Trade Center disaster.  During an exacerbation he may miss numerous days of work.

Administrative Record ("Admin. R.") at 463.

In addition, on an unspecified date, Dr. Schulster completed a document entitled "Treating Doctor's Patient Functional Assessment to do Sedentary Work," in which he opines that the Plaintiff could only stand and/or walk for less than two hours in an eight-hour day; that he could sit for less than four hours in an eight-hour day; that, if required to do so, he could lift and/or carry between five and ten pounds for one-third of an eight-hour work day; that, if required to do so, he could lift and/or carry less than five pounds for two-thirds of an eight-hour work day; and that he has environmental restrictions due to physical limitations and/or sensitivity.  The Court notes that Dr. Schulster left blank the portion of the form which required him to indicate any diagnostic and clinical findings to support his opinions.  Also, as noted above, Dr. Schulster did not provide the date of this assessment.

## B.    The Medical Evidence Relating to Treating Source Mitchell Goldstein

The record further reflects that the Plaintiff was treated by Dr. Mitchell Goldstein, of Orlin & Cohen Orthopedic Associates LLP, from June 2011 through February 2013.

In his earliest treatment notes, dated June 2, 2011, Dr. Goldstein states that the Plaintiff reported a "long history of neck and low back pain," which included difficulty sleeping and performing the activities of daily living.  In particular,

Paskins reported pain in his lower back and neck radiating down between his shoulder blades for the past year. He further reported sharp pain in his shoulders, which limited his range of motion and caused difficulty reaching. His legs became numb if he lied on his stomach. During times of rest, the Plaintiff rated the painfulness of his symptoms as a "3" on a 10-point scale; when active, the pain grew to 8-out-of-10. He had been treating these symptoms with cyclobenzaprine, a muscle relaxant, and oxycodone, a pain reliever.

On that date, Dr. Goldstein examined the Plaintiff's range of motion in his shoulders, neck, and back, and recorded a series of relevant measurements, which the Court will now discuss in greater depth.

Turning first to the Plaintiff's shoulders, Dr. Goldstein tested the degree to which the Plaintiff could lift his arms straight in front of him, a shoulder movement known as "forward flexion." In both shoulders, the Plaintiff achieved forward flexion of 140 degrees. Next, Dr. Goldstein tested the degree to which the Plaintiff could raise his arms laterally, a shoulder movement known as "abduction." In both shoulders the Plaintiff achieved abduction of 125 degrees. Third, Dr. Goldstein tested the degree to which the Plaintiff could rotate his arm outward, while maintaining a right angle in his elbow, a shoulder movement known as "external rotation." In both shoulders, the Plaintiff achieved external rotation of 70 degrees. Lastly, Dr. Goldstein tested the degree to which the Plaintiff could similarly rotate his arms inward, a shoulder movement known as "internal rotation." In both shoulders, the Plaintiff achieved internal rotation of 30 degrees.

Dr. Goldstein noted that the Plaintiff experienced pain while performing these movements, particularly at the endpoints of his range of motion, and specifically in his anterior rotator cuff.

Dr. Goldstein also performed a series of similar tests to measure the Plaintiff's ability to move his neck. For example, Dr. Goldstein tested the degree to which the Plaintiff could bend his head forward, namely, "flexion"; and the degree to which he could tilt his head backward, namely, "extension." The Plaintiff completed these movements to 20 and 40 degrees, respectively. Dr. Goldstein also tested the degree to which the Plaintiff could tilt his head to the side in either direction, neck movements known as left and right "lateral flexion." The Plaintiff achieved lateral flexion of 5 degrees in both directions. Lastly, Dr. Goldstein tested the degree to which the Plaintiff could rotate his head in either direction, neck movements known as "lateral rotation." The Plaintiff achieved lateral rotation of 45 degrees in either direction.

Again, with regard to his neck, Dr. Goldstein noted that the Plaintiff had experienced pain performing these movements, particularly pain and tenderness at the endpoint of each range of motion.

Turning next to the Plaintiff's back, Dr. Goldstein performed a series of tests to measure the Plaintiff's ability to flex, extend, and bend his spine in various directions. In this regard, Dr. Goldstein tested the degree to which the Plaintiff could bend forward, "flexion"; bend backward, "extension"; bend laterally; and rotate at the waist. The Plaintiff achieved forward flexion of 45 degrees; extension

of 10 degrees; bilateral bending of 10 degrees; and bilateral rotation of 15 degrees. Dr. Goldstein noted that the Plaintiff possessed a diminished capacity to flex, extend, and laterally bend his spine. He also observed that Paskins experienced soreness in his lumbar spine and altered sensation, namely, numbness, in his legs when lying prone.

X-rays of the Plaintiff's cervical spine and lumbar spine indicated straightening consistent with spasm and facet arthropathy. As one district court has noted, "[f]acet arthropathy is a disease of the facet joints in the spine resulting from degeneration and arthritis." Brauer v. Astrue, 11-cv-141, 2012 U.S. Dist. LEXIS 55757, at *3 n.1 (D. Vt. Apr. 20, 2012) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 149 (27th ed. 1988)). The x-rays of his lumbar spine also showed minimal disc space narrowing.

Additional x-rays were taken of the Plaintiff's pelvis and shoulders. However, Dr. Goldstein noted that these images were unremarkable.

Based on his observations during the June 2, 2011 visit, Dr. Goldstein's assessment included: cervicalgia, which is "a general term that describes neck pain," Mnich v. Colvin, 14-cv-740, 2015 U.S. Dist. LEXIS 162181, at *68 n.20 (N.D.N.Y. Sept. 8, 2015) (Report and Recommendation), adopted, 2015 U.S. Dist. LEXS 161414 (N.D.N.Y. Dec. 2, 2015); myositis, or muscular inflammation, see STEDMAN'S at 1176; lumbago, which is a "descriptive term" for "[p]ain in [the] mid and lower back," id. at 1034; lumbar sprain; thoracic sprain; shoulder pain; and bursitis of the shoulder. The Court notes that "bursitis" refers to the inflammation

of a bursa, which is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." <u>Crum v. Marini</u>, 06-cv-513, 2008 U.S. Dist. LEXIS 10678, at *6 n.3 (N.D.N.Y. Jan. 26, 2009) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 238, 240 (28th ed. 1994)) (Report and Recommendation), <u>adopted</u>, 2009 U.S. Dist. LEXIS 5287 (N.D.N.Y. Jan. 26, 2009).

On June 29, 2011, the Plaintiff followed up with Dr. Goldstein to receive the results of an MRI. According to the relevant treatment records, the MRI revealed mild degenerative disc disease in the Plaintiff's lumbar spine, as well as cervical disc protrusions at C4-5 C6-7 and a disc bulge at C3-4.

On this date, Dr. Goldstein also conducted a physical examination of the Plaintiff's neck and back. Measuring the same joint movements outlined above, Dr. Goldstein noted that Paskins achieved forward neck flexion of 20 degrees; neck extension of 5 degrees; bilateral neck flexion of 5 degrees; and bilateral neck rotation of 45 degrees. With respect to his lumbar spine, Dr. Goldstein noted that Paskins achieved forward flexion of 30 degrees; extension of 5 degrees; bilateral bending of 5 degrees; and bilateral rotation of 15 degrees. Again, the records reflect pain performing these movements, as well as muscle spasm.

In addition to the cyclobenzaprine and oxycodone that the Plaintiff was taking, Dr. Goldstein prescribed prednisone, which, as noted above, is a steroid. The June 29, 2011 records also indicate that Paskins had been attending physical therapy.

On August 10, 2011, Paskins again followed up with Dr. Goldstein, with complaints of increased pain in his lower back and neck. Treatment notes from this visit indicate that the Plaintiff had ceased physical therapy because he felt it was not helping his condition. The results of a physical examination were the same as recorded during his prior visit on June 29, 2011. However, Dr. Goldstein prescribed Percocet to treat episodes of severe pain, and recommended a workup for sleep apnea, weight loss, and exercise, including yoga and pilates.

Paskins returned to Dr. Goldstein for follow-up visits on September 21, 2011; November 9, 2011, February 20, 2012; and September 27, 2012, each time complaining of continued pain and stiffness in his neck and back. On September 27, 2012, he also reported experiencing shooting pain at the base of his skull. The results of physical examinations performed during each of these visits were the same in all material respects as those recorded during prior visits. However, Dr. Goldstein's notes from September 21, 2011, indicate that the Plaintiff had not been evaluated for sleep apnea, as previously recommended. Further, throughout these visits, Dr. Goldstein recommended weight loss, home exercise, and chiropractic care. At times, he also prescribed Vicodin, a pain reliever, and Soma, a muscle relaxant.

Similar to Dr. Schulster, on January 7, 2013 Dr. Goldstein completed a "Treating Doctor's Patient Functional Assessment to do Sedentary Work" form, in which he opined that the Plaintiff could stand and/or walk for less than two hours in an eight-hour day; that he could sit for less than four hours in an eight-hour day; that, if required to do so, he could lift and/or carry between five and ten pounds for

one-third of an eight-hour work day; and that, if required to do so, he could lift and/or carry less than five pounds for two-thirds of an eight-hour work day.

Further, Dr. Goldstein identified the following limitations which, in his opinion, would interfere with the Plaintiff's ability to work a full-time job: Paskins requires periods of bed rest during the work day; he requires frequent breaks during the day; he suffers with pain, which prevents him from performing eight hours of work; he would have difficulty concentrating on his work; he would require an average of two or more sick days off her month; and he has environmental restrictions due to physical illness or sensitivity. In sum, Dr. Goldstein concluded that the Plaintiff "is totally disabled and unable to work [in] any capacity."

With regard to relevant clinical and diagnostic studies, Dr. Goldstein noted that x-rays had been taken of the Plaintiff's cervical spine on June 2, 2011, which showed a "small disc bulge slightly eccentric to the right" and "mild posterior protrusions at C4-5 and C5-6." Further "C6-7 central disc protrusion results in mild to moderate thecal sac compression." Dr. Goldstein also noted that an MRI of the Plaintiff's cervical spine and lumbar spine on June 17, 2011 had shown "mild degenerative disc disease without disc protrusion or thecal sac compression or neural foraminal compromise."

Dr. Goldstein summarized his clinical findings as follows:

Constant and severe radiating pain neck and back. Bursitis of shoulder, cervicalgia, lumbago, lumbar sprain, myositis, neck pain, shoulder pain, thoracic sprain. [Patient] has severe and radiating pain, weakness, muscle spasm, diminished flexibility, extension, rotation, and diminished lateral bending. Decreased [range of motion],

ambulation. [Patient] suffers from fatigue and inability of prolonged sitting, standing, walking due to [illegible] pain and weakness.

Admin. R. 527.

Thereafter, on February 21, 2013, Dr. Goldstein prepared a "narrative report" relating to his treatment of the Plaintiff. The Court has reviewed this report and finds that it substantially outlines the contents of the treatment records described above and does not require further discussion at this time.

## C.    The Relevant Administrative Proceedings

As noted above, on January 18, 2011, the Plaintiff filed an application for Social Security disability benefits for the Relevant Time Period, namely, June 30, 2010 to December 31, 2012. On or about February 17, 2011, the Social Security Administration ("SSA") denied his application.

### 1.    The Hearing

At the Plaintiff's request, a hearing was held on January 28, 2013 before Administrative Law Judge ("ALJ") April M. Wexler.

#### a.    The Testimony of the Plaintiff

The Plaintiff testified that he lives in Levittown with his five children – then-aged 23, 21, 20, 16 and 15 – and his brother. He is the primary caregiver of his children and relies upon his NYPD pension to support himself. He has a driver's license and is able to drive.

Paskins completed less than two years of college before joining the police department in January 1986. After retiring in 2007, he created a private security company, which provided security guards and bouncers to bars and nightclubs. He

stated that he performed some of this security work himself. However, the company went out of business in June 2010.

Asked by the ALJ what currently is preventing him from working, Paskins responded that he has a lot of pain in his neck and his back, which shoots down his right arm and legs. In this regard, Paskins testified that he treats his symptoms with Percocet four times per week, and Cyclobenzaprine once every two weeks. Paskins testified that he has not undergone diagnostic testing since his June 2011 MRI, and that he attended twelve session of physical therapy, but felt that it did not help his symptoms. His doctors have not recommended surgery.

Paskins also testified about the manner in which he treats his respiratory condition. In this regard, he stated that he inhales a dose of an unspecified medication from a nebulizer upon waking up in the morning. Apparently, this medication makes him feel "shaky," so he has to eat shortly thereafter. He takes another dose of the medication several hours after eating. In addition, Paskins stated that he takes two doses of ProAir before going to sleep and on an as-needed basis throughout the day, namely, if his chest "get[s] tight." Once or twice per year, he also introduces Prednisone, a steroid, into his treatment regimen.

Paskins testified that his respiratory condition makes him prone to developing bronchitis at a higher rate than normal, approximately four times per year. His symptoms include becoming "[r]eally congested, really tight in [his] chest, . . . wheezing, difficulty sleeping [and] breathing." He stated that particularly severe bouts of bronchitis are treated with Prednisone.

Paskins further testified that exposure to airborne irritants such as cologne or cleaning fluids prevent him from performing certain activities. For example, he is unable to attend his sixteen-year-old daughter's high school basketball games because, if "[s]omeone has heavy cologne or perfume," it "chokes" him. If Lysol is sprayed inside his house, he will experience similar symptoms. He also does not go outside on a daily basis because his respiratory impairment is worsened by extreme temperatures.

Relevant here, the Plaintiff testified that he can only sit for approximately 20 to 25 minutes before needing to stand up and walk around; and that he can stand for approximately 15 to 20 minutes before needing to sit back down. He stated that he can walk for approximately two or three blocks, before his pulmonary impairment causes him to experience coughing fits and occasionally to vomit. He also experiences back pain from walking such distances. He estimates that he can lift approximately eight pounds, which is the weight of a gallon of milk.

Paskins testified that, in a typical day, he does very little. He stated that he generally reads the newspaper, watches television, and waits for his children to come home from school. Although he is able to drive, he does so infrequently and relies upon his brother to assist with routine tasks, such as transporting his younger children, grocery shopping, and going to the bank. He testified that he does not leave the house to socialize and does not go out for meals, although friends will occasionally visit him at home. He has no hobbies and is no longer able to play golf, as he once was.

### b.    The Testimony of Vocational Expert Victor Alberigi

An independent vocational expert named Victor Alberigi also testified at the hearing.

The ALJ asked Alberigi to assume the following hypothetical individual, whose limitations substantially resemble those of the Plaintiff:

> [A]ssume a hypothetical individual of the claimant's age and education and with the past jobs [of a police officer and security guard]. . . . [A]ssume this individual is limited to sedentary work; that he can occasionally lift ten pounds; sit for approximately six hours; stand or walk for approximately two hours in an eight-hour day with normal breaks; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and craw[l]; unlimited push and pull; and must avoid all exposure to fumes, odors, dust, gases, poor ventilation and temperature extremes such as excessive heat or excessive cold.

Admin. R. 73.

Alberigi testified that this hypothetical individual could not perform any of the Plaintiff's past work.  However, he testified that other jobs exist in the national economy, which this hypothetical individual could perform, namely, that of a document preparer, an envelope addresser, and a surveillance system monitor.  However, Alberigi testified that, if he were to further assume that the hypothetical individual would be absent from work three or four times per month, he likely would not be able to hold these, or any other, positions in the local or national economy.

### 2.    The ALJ's Decision

On February 5, 2013, the ALJ issued a written decision denying the Plaintiff's claim for disability benefits.

The ALJ found that the evidence was sufficient to establish that Paskins suffered from three severe impairments during the Relevant Time Period, namely, asthma, degenerative disc disease, and arthritis. However, she further found that he retained the residual functional capacity ("RFC") to perform sedentary work.

Relevant here, the ALJ afforded little weigh to Dr. Goldstein's opinion that the Plaintiff is totally disabled and unable to work in any capacity. In this regard, she noted that such an opinion is inconsistent with the doctor's minimal findings relating to the Plaintiff's back and the conservative treatment that he provided. In particular, the ALJ noted that the MRI of the Plaintiff's spine showed "nothing greater than a small disc bulge and mild protrusions," for which the Plaintiff was prescribed pain killers and muscle relaxants, and attended twelve sessions of physical therapy. The ALJ further noted that, on his January 7, 2013 functional assessment form, Dr. Goldstein checked every available symptom box, "most of which are not supported by clinical findings."

In support of her conclusion regarding Dr. Goldstein's opinion, the ALJ noted that there is no evidence of herniation, compression fracture, or deformity in the Plaintiff's spine. There also is no significant nerve root compression. She noted that the Plaintiff ambulates with a normal gait, does not wear a back or neck brace, and experiences no related bowel or bladder dysfunction. She noted that there is no evidence of muscle wasting, asymmetry or atrophy, and surgery has not been recommended. In this regard, the ALJ found that the relevant treatment records do no support the Plaintiff's subjective testimony that the intensity, persistence and

functionally limiting effects of his symptoms prevent him from sitting for more than twenty minutes; standing for more than twenty minutes; lifting and carrying more than eight pounds; and walking only two to three blocks.

The ALJ also afforded little weight to Dr. Schulster's opinion regarding the Plaintiff's disabling restrictions, namely, that he can stand for less than two hours, sit for less than four hours, and only lift between five and ten pounds. In this regard, the ALJ noted that these findings are not within Dr. Schulster's area of pulmonary expertise and are not supported by any of his clinical findings. However, the ALJ credited the portion of Dr. Schulster's opinion that identified environmental restrictions, namely, the adverse effects that airborne irritants such as chemicals, cleansers, dust and perfumes have on the Plaintiff's pulmonary impairment.

In support of her conclusion regarding Dr. Schulster's opinion, the ALJ noted that, although Paskins suffers from reactive airway disease, the evidence was not sufficient to conclude that this condition is disabling. For example, treatment records pre-dating the Relevant Time Period indicated no abnormalities in the Plaintiff's ears, sinuses and nose, and physical examinations of his chest and lungs in 2005 were normal. Relevant here, although Dr. Schulster observed abnormal breath and/or voice sounds, he noted only mild diffuse wheezing and no other clinically remarkable features of the Plaintiff's chest and lungs. Further, the ALJ noted that there was no evidence of any hospital admissions or emergency room visits for uncontrolled asthma or breathing issues. In addition, the Plaintiff did not

testify that he required the use of any special devices in his home, such as air purifiers, dehumidifiers, or humidifiers to help with his condition. Rather, he stated that his condition is sufficiently addressed by his brother cleaning the house well. In the ALJ's view, these facts were not indicative of a respiratory impairment that is so severe as to be disabling.

Ultimately, relying upon the testimony of the vocational expert, the ALJ concluded that, although the Plaintiff's severe impairments would prevent him from performing his past work as a police officer or security guard, other jobs existed in the national and local economy that the Plaintiff could have performed during the Relevant Time Period. In particular, the ALJ determined that, in light of the Plaintiff's age, education, work experience, and RFC to perform the full range of sedentary work, he was capable of making a successful adjustment to other work that existed in significant numbers in the economy, including the representative occupations identified by Alberigi, namely, document preparer, envelope addresser, or surveillance system monitor.

Thus, the ALJ determined that the Plaintiff was not under a disability during the Relevant Time Period and was not entitled to associated benefits.

### 3.     The Appellate Procedure

On February 28, 2013, Paskins, through counsel, sought review of the decision of ALJ Wexler by the Appeals Council. On May 9, 2014, the Appeals Council denied the Plaintiff's request for review, making the ALJ's written decision the final decision of the Commissioner.

On July 2, 2014, Paskins commenced the present appeal, seeking this Court's review of the Commissioner's decision. As noted above, both parties have moved for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c).

## II.     Discussion

The Plaintiff asserts two bases for overturning the Commissioner's decision and granting judgment in his favor: (1) the ALJ improperly gave little weight to the opinions of his treating physicians, namely, Dr. Schulster and Dr. Goldstein; and (2) the ALJ failed to recognize that he was almost 50 years old at the conclusion of the Relevant Time Period, which would have required her to apply a more favorable analytical framework to his claim.

The Commissioner contends that these arguments lack merit, and asserts that substantial evidence in the record supports her denial of benefits.

## A.     The Standard of Review

"Judicial review of the denial of disability benefits is narrow" and "[t]he Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." Koffsky v. Apfel, 26 F. Supp. 475, 478 (E.D.N.Y. Nov. 16, 1998) (Spatt, J.); see Pereira v. Astrue, 279 F.R.D. 201, 205 (E.D.N.Y. 2010) (noting that "the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive" and "the only issue before the Court is whether the ALJ's finding that Plaintiff was not eligible for disability benefits was 'based on legal error

or not supported by substantial evidence' " Id. (quoting Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999))).

In applying this standard, the Court " 'may not substitute its own judgment for that the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.' " Id. (quoting Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991)).

**B.     As to the Plaintiff's First Contention – Whether the ALJ Erroneously Afforded Little Weight to the Opinions of His Treating Physicians**

As noted above, the Plaintiff first contends that the Commissioner's decision should be overturned because the ALJ gave little weight to the opinions of his treating physicians, namely, Dr. Schulster and Dr. Goldstein.

**1.     The Applicable Law**

The opinions of a claimant's treating physician are generally entitled to controlling weight.  See, Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). However, it is well-settled that this rule – commonly known as the "treating physician rule" – is inapplicable where the treating physician issued opinions that are not consistent with other substantial evidence in the record.  See id.; see also 20 C.F.R. § 404.1527(d)(2)).

Where, as here, the ALJ declines to give controlling weight to a treating physician's opinion, he or she must "provide the claimant with good reasons for doing so," id., and must consider various factors to determine how much weight to give the opinion.  In particular, "to override the opinion of the treating physician, [the Second Circuit] ha[s] held that the ALJ must explicitly consider, *inter alia*, (1)

the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether physician is a specialist." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (citing Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008))

In this regard, the Second Circuit will refrain from disturbing an ALJ's decision on this basis, so long as the ALJ did not "traverse the "substance of the [ ] rule." Torres v. Colvin, 12-cv-6527, 2013 U.S. Dist. LEXIS 184049, at *53 (S.D.N.Y. Dec. 13, 2013) (Report and Recommendation), adopted, 2014 U.S. Dist. LEXIS 7810 (S.D.N.Y. Jan. 22, 2014); see Halloran, 362 F.3d at 32; see also Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (finding that the ALJ had not traversed the substance of the treating physician rule where he specifically acknowledged the rule and noted that the treating physician's opinion was contradicted by the opinions of other physicians in the record; was not corroborated in his contemporaneous treatment notes; and was neither supported by medical signs and laboratory findings nor accompanied by an explanation); accord Thompson v. Astrue, 12-cv-7024, 2014 U.S. Dist. LEXIS 93023, at *37-*38 (S.D.N.Y. July 7, 2014) (Report and Recommendation) (finding that the ALJ properly "applied the substance of the treating physician rule by considering the medical support for [the treating source's] opinion and the consistency of her opinions with the other evidence in the record and gave good reasons for his rejection of her opinions" (internal quotation marks and citations omitted)), adopted, 2014 U.S. Dist. LEXIS 177847 (S.D.N.Y. Dec. 29,

2014); <u>Rehr v. Barnhart</u>, 431 F. Supp. 2d 312, 319-20 (E.D.N.Y. 2006) (where it was unclear from the face of the ALJ's decision whether he "considered (or was even aware of) the treating physician rule," the district court nevertheless affirmed the Commissioner's decision because a careful review of the record showed that ALJ "applied the substance of the treating physician rule").

Central to the Plaintiff's position is the principle that "[n]either a reviewing judge nor the Commissioner is 'permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion.' " <u>Burgess</u>, 537 F.3d at 131 (quoting <u>Shaw v. Chater</u>, 221 F.3d 126, 134 (2d Cir. 2000)).    In this regard, the Second Circuit has noted that, absent "overwhelmingly compelling" evidence to the contrary, <u>Rosa</u>, 168 F.3d at 79, the ALJ " 'is not free to set his own expertise against that of a physician who [submitted an opinion to or] testifies before him,' " <u>Balsamo v. Chater</u>, 142 F.3d 75, 81 (2d Cir. 1998) (<u>McBrayer v. Sec. of Health and Human Servs.</u>, 712 F.2d 795, 799 (2d Cir. 1983)).

### 2. Application to the Facts as they Relate to the Opinions of Dr. Schulster

As noted above, Dr. Schulster opined that the Plaintiff's respiratory condition precluded the performance of any work and that his symptoms would likely increase with even light physical exertion.   In this regard, Dr. Schulster opined that the Plaintiff was incapable of sustaining a job that required him to stand "for much of the day," or to lift more than "a few pounds on a sustained basis."   He also completed a functional assessment form on which he checked a series of boxes to indicate that the Plaintiff could only stand and/or walk for less than two hours in an

eight-hour day; sit for less than four hours in an eight-hour day; could, if so required, lift and/or carry between five and ten pounds for one-third of an eight-hour work day, or less than five pounds for two-thirds of an eight-hour work day.

In this regard, Dr. Schulster stated that his conclusions were confirmed by "numerous testing," but did not otherwise support his findings with reference to diagnostic or clinical studies.

Nevertheless, the Plaintiff contends that Dr. Schulster's opinions relating to his exertional limitations are consistent with the results of the spirometry testing performed during the Relevant Time Period. He argues that Dr. Schulster was in the best position to interpret these tests, and that, in the absence of "overwhelmingly compelling" evidence to the contrary, the conclusions that Dr. Schulster drew from them relating to the Plaintiff's capacity to perform work should control. Paskins contends that the ALJ improperly set her own view of the medical proof against the opinions of Dr. Schulster. The Court disagrees.

To the extent that Dr. Schulster issued opinions that are not consistent with other substantial evidence in the record, the ALJ was authorized to reject them. In this regard, the rules expressly permit the ALJ to identify evidentiary conflicts in the record and resolve them as she sees fit. The only caveat: when exercising this authority, the ALJ is under an added obligation to weigh certain relevant factors and articulate good reasons for her decision – a burden that, in this Court's view, ALJ Wexler suitably discharged in this case.

On the whole, the record does not support the Plaintiff's contention that ALJ Wexler performed an independent review of the medical data and set her own diagnostic opinions against those of Dr. Schulster. On the contrary, ALJ Wexler noted that Dr. Schulster's opinion that the Plaintiff was severely limited in his capacity to perform even sedentary work was inconsistent with his own treatment records, which only noted mild wheezing and some abnormal breath and/or voice sounds, but otherwise unremarkable examinations of the Plaintiff's chest and lungs.

To the extent that Dr. Schulster's opinions are based upon the results of spirometry testing – as the Plaintiff assumes – he does not specifically say so anywhere in the treatment records, his opinion letter, or his functional assessment form. In this regard, Dr. Schulster's opinions are not accompanied by any explanation or analysis of the testing. Instead, he states only that his opinions are confirmed by "numerous" unspecified tests, and, of note, he left totally blank the portion of the functional assessment form which required him to indicate any diagnostic and clinical findings that supported his opinions regarding the Plaintiff's ability to work. In this regard, the Court is unable to discern any place that Dr. Schulster offered a cogent interpretation of the medical data; thus, it cannot be said that ALJ Wexler countered her own interpretation of the spirometry tests against his.

In the Court's view, under these circumstances, the ALJ was well within her authority to test the accuracy and reliability of Dr. Schulster's opinions against the record as a whole. In doing so, she identified substantial clinical and diagnostic

evidence that undermined Dr. Schulster's opinion regarding the Plaintiff's capacity to perform work. In particular, as noted above, the ALJ noted treatment records pre-dating the Relevant Time Period, which revealed no abnormalities in the Plaintiff's ears, sinuses and nose, and reflected unremarkable physical examinations of his chest and lungs. She also considered the Plaintiff's testimony, which made no mention of hospital admissions or emergency room visits to treat his allegedly disabling respiratory impairment.

Accordingly, the Court finds that ALJ Wexler's decision complies with the applicable regulations and the treating physician rule insofar as it addresses the relevant interpretive factors and sets forth good reasons for her decision not to afford controlling weight to the portions of Dr. Schulster's opinions that were contrary to other substantial evidence in the record.

In reaching this conclusion, the Court notes that, although not fully accepting Dr. Schulster's opinions regarding the Plaintiff's functional capacity, the ALJ did conclude that, due in part to his severe respiratory condition, the Plaintiff would be unable to perform his past work and would instead be relegated to sedentary work, which, as the ALJ put it, requires "an extremely low level of exertion." In the Court's view, this determination is consistent with Dr. Schulster's broader clinical findings, although not a wholesale adoption of his opinions.

Further, ALJ Wexler appropriately credited certain other portions of Dr. Schulster's overall opinion, which she found to be adequately supported by the record. For example, the ALJ accepted Dr. Schulster's opinion regarding the extent

to which the Plaintiff has environmental limitations and must avoid exposure to dust and caustic chemicals. In fact, she explicitly instructed the vocational expert to consider this additional limitation in determining whether there existed jobs in the national economy that Paskins could still perform. In the Court's view, these facts indicate a measured approached by the ALJ to identify evidentiary conflicts in the record; weigh the relevant proof; and resolve them in accordance with the applicable regulations.

Accordingly, the Court finds no error in the manner in which ALJ Wexler weighed the opinions of Dr. Schulster. It further finds the ALJ's conclusions relating to the Plaintiff's respiratory impairment to be supported by substantial evidence in the record.

### 3. Application to the Facts as they Relate to the Opinions of Dr. Goldstein

Also as noted above, Dr. Goldstein opined that the Plaintiff "is totally disabled and unable to work [in] any capacity." In support of this opinion, Dr. Goldstein relied upon June 2011 x-rays and MRI images of the Plaintiff's cervical and lumbar spine, which showed minor disc bulging and degenerative disc disease. He also noted severe pain, muscle spasms, fatigue, and diminished range of motion, as well as decreased flexibility, extension, rotation and lateral bending. On a functional assessment form, Dr. Goldstein indicated that the Plaintiff could stand and/or walk for less than two hours in an eight-hour day; sit for less than four hours in an eight-hour day; if required to do so, could lift and/or carry between five and

ten pounds for one-third of an eight-hour work day, and less than five pounds for two-thirds of an eight-hour work day.

The Plaintiff again contends that the ALJ wrongfully substituted her own lay opinion as to the severity and functional limitations of the Plaintiff's orthopedic impairments for those of Dr. Goldstein. In this regard, the Court acknowledges that certain language used by the ALJ in her written decision is consistent with such a contention. For example, the ALJ appears to offer an independent diagnostic analysis of the MRI images by stating that they showed "nothing greater than a small disc bulge and mild disc protrusions." However, even disregarding such statements, on the whole, the Court disagrees with the Plaintiff's contentions and finds the ALJ's evaluation of Dr. Goldstein's opinion to be supported by substantial evidence and in compliance with the applicable regulations.

As discussed more fully above, the ALJ was authorized to reject any portions of Dr. Goldstein's opinions that were inconsistent with the weight of the record evidence, provided, however, that she considered the relevant evaluative factors and stated valid reasons for her decision. The Court is satisfied that she did so.

As was true with Dr. Schulster, the ALJ noted substantive inconsistencies between Dr. Goldstein's opinions regarding the Plaintiff's functional limitations and his own treatment records. For example, Dr. Goldstein's opinion that the Plaintiff is totally disabled is contradicted by an objectively conservative course of recommended treatment, which did not include any recommendation for surgery or epidural injections, and instead recommended exercises such as yoga and pilates,

and weight loss.  In this regard, the Court notes that the full extent of the Plaintiff's treatment for his orthopedic impairments includes taking a muscle relaxant twice monthly, and a pain reliever four times per week.

Further, the ALJ noted that, on his functional assessment form, Dr. Goldstein checked every single symptom box, many of which indicated occupational limitations that have no relationship to his treatment of the Plaintiff and the associated medical evidence.  For example, Dr. Goldstein opined that Paskins would have difficulty concentrating on his work and would require an average of two or more sick days per month.  However, the Court is unable to identify any evidence connecting these conclusions to the clinical findings of minor disc bulging and degenerative disc disease, and the Plaintiff has not identified any.  Further, Dr. Goldstein opined that the Plaintiff is unable to work due to various environmental restrictions.   Presumably, this conclusion relates to the Plaintiff's respiratory impairment – a matter not within Dr. Goldstein's professional area of specialization.

Again, the Court notes that, despite declining to fully accept as controlling Dr. Goldstein's opinions regarding the Plaintiff's functional capacity, the ALJ nevertheless determined that the Plaintiff's severe orthopedic impairment would, in fact, prevent him from returning to his past work and would relegate him to sedentary work.  In this regard, ALJ Wexler noted that she took into account the "evidence and testimony that [Paskins] suffers from a severe back . . .  impairment"

and determined that limiting him to sedentary work "account[ed] for the limitations that these conditions would place upon him."

In the Court's view, this reasoning demonstrates that the ALJ did not, as the Plaintiff contends, "lightly dismiss" Dr. Goldstein's opinions. Rather, the record is clear that she capably evaluated which aspects of his opinions found support in the clinical and diagnostic evidence, and resolved the apparent evidentiary conflicts accordingly. Thus, the Court finds no error in the manner in which ALJ Wexler weighed the opinions of Dr. Goldstein. It further finds the ALJ's conclusions relating to the Plaintiff's orthopedic impairment to be supported by substantial evidence in the record.

Accordingly, the Commissioner's motion, to the extent it seeks to affirm the denial of benefits on the ground that the ALJ's evaluation of the treating source evidence is supported by substantial evidence in the record, is granted. Further, the Plaintiff's cross-motion, to the extent that it seeks to overturn the Commissioner's decision for failing to give controlling weight to his treating physicians, is denied.

## C. As to the Plaintiff's Second Contention – Whether the ALJ Erroneously Failed to Identify a So-Called "Borderline Age Situation"

As noted above, the Plaintiff next contends that the ALJ failed to recognize that that his age during the Relevant Time Period required her to apply a more favorable analytical framework to his claim for benefits, namely, the rules applicable to older individuals.

### 1. The Applicable Law

In determining whether a claimant is disabled, the regulations require the Commissioner to consider various relevant factors, including: (i) the claimant's age at the onset of his or her impairment; and (ii) the likelihood that he or she can successfully adjust to a new occupation. Under the regulations, older individuals with non-transferrable job skills are more likely to be found disabled than younger individuals whose job skills are transferrable to other kinds of work.

In this regard, the regulations state as follows:

> When we decide whether you are disabled . . ., we will consider your chronological age in combination with your residual functional capacity, education, and work experience. . . . In determining the extent to which age affects a person's ability to adjust to other work, we consider advancing age to be an increasingly limiting factor in the person's ability to make such an adjustment . . .

20 C.F.R. § 404.1563(a).

Claimants are classified by the following age categories: (i) a "younger person," namely, someone under the age of 50, whose age generally will not seriously affect his or her ability to adjust to other work; (ii) a "person closely approaching advanced age," namely, someone between the ages of 50 and 54, whose age may, when considered along with the severity of the impairment and the nature of his or her prior work experience, be able to successfully adjust to other work; and (iii) a "person of advanced age," namely, someone aged 60 or older, whose age generally will significantly affect his or her ability to adjust to other work. See 20 C.F.R. § 404.1563(c)-(e).

Relevant here, a so-called "borderline age situation" arises when a claimant's age overlaps between these categories. <u>See</u> <u>Souliere v. Colvin</u>, 13-cv-236, 2015 U.S. Dist. LEXIS 1246, at *11 (D. Vt. Jan. 7, 2015). In particular, the regulations require that if a claimant is "within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case." <u>Id.</u> at *11-*12 (quoting 20 C.F.R. § 404.1563(b)).

Thus, the regulations place the burden on the ALJ to recognize whether a claimant is approaching an age that would qualify him or her for a higher age category; whether utilizing the higher age category would result in a more favorable outcome for that claimant; and if so, whether, in fact, to utilize the higher age category in making a disability determination. More particularly, courts have developed a two-part test for identifying borderline age situations. As appropriately stated by a district court within this Circuit:

> 1. Determine whether the claimant's age is within a few days or a few months of a higher age category.
>
> 2. If so, determine whether using the higher age category would result in a decision of "disabled" instead of "not disabled."

<u>Metaxotos v. Barnhart</u>, 04-cv-3006, 2005 U.S. Dist. LEXIS 26463, at *21 (S.D.N.Y. Nov. 7, 2005) (quoting the Social Security Administration Hearings, Appeal and Litigation Manual, also known as "HALLEX," at 5-302(A)).

The second part of this test, namely, whether the higher age category would result in a decision of "disabled" instead of "not disabled," requires reference to a chart known as the Medical-Vocational Guidelines, also commonly referred to as the "Grids," which illustrates the impact that a claimant's age, education, work experience, and transferability of occupational skills have on the ultimate disability determination. See 20 C.F.R., Part 404, Subpart P, Appendix 2, Table No. 1.

Relevant here, the Court has reproduced the following limited portion of the Grids:

| Rule | Age | Education | Previous Work Experience | Decision |
|---|---|---|---|---|
| 201.14 | Closely approaching advanced age | High school graduate or more – does not provide for direct entry into skilled work. | Skilled or semi-skilled – skills not transferrable | Disabled. |
| 201.15 | Closely approaching advanced age | High school graduate or more – does not provide for direct entry into skilled work. | Skilled or semi-skilled – skills transferrable | Not disabled. |
| 201.16 | Closely approaching advanced age | High school graduate or more – provides for direct entry into skilled work. | Skilled or semi-skilled – skills not transferrable | Not disabled. |
| 201.21 | Younger individual age 45-49 | High school graduate or more. | Skilled or semi-skilled – skills not transferrable | Not disabled. |
| 201.22 | Younger individual age 45-49 | High school graduate or more. | Skilled or semi-skilled – skills transferrable | Not disabled. |

If the answer to one or both of the questions comprising the relevant two-part test is "no" – that is, if the claimant is either (a) not approaching a higher age category, or (b) is nearing a higher age category, but would nevertheless be declared disabled under the Grids – then a borderline age situation either does not exist or would not affect the outcome. See Metaxotos, 2005 U.S. Dist. LEXIS 26463, at *21.

However, if the answer to both questions is "yes" – that is, the claimant is approaching a higher age category *and* utilizing the higher age category would yield a more favorable result under the Grids – then a borderline age situation does exist and the ALJ is required to undertake a further analysis to decide whether it is more appropriate to use the higher age category or the claimant's actual chronological age. See id.

**2.      Application to the Facts of this Case**

It is undisputed that, at the conclusion of the Relevant Time Period, the Plaintiff was approximately three months away from turning 50, and therefore, from graduating from the "younger individual age 45-49" classification to the "person closely approaching advanced age" classification. Thus, the Plaintiff contends that this created a borderline age situation, which obligated ALJ Wexler to evaluate his claim under both age classifications and apply whichever was most favorable to him. The Court agrees.

The ALJ's decision makes explicit findings relating to the relevant criteria featured in the Grids. In particular, she found that the Plaintiff "was born on April 4, 1963 and was 49 years old, which is defined as a younger individual age 45-49, on the date last insured." She found that he "has at least a high school education and is able to communicate in English." Further, the vocational expert testified that the Plaintiff's past work required him to be skilled or semi-skilled. However, ALJ Wexler stated that "[t]ransferability of job skills is not material to the determination of disability because using the [Grids] as a framework supports a

finding that the claimant is 'not disabled,' whether or not [he] has transferable job skills."

On its face, this determination is not erroneous. As indicated above, the ALJ was correct that the Grids require a finding of "not disabled" for an individual of the Plaintiff's chronological age, 49, education, and work experience, regardless of whether his job skills are transferrable:

| Rule | Age | Education | Previous Work Experience | Decision |
|------|-----|-----------|--------------------------|----------|
| 201.21 | Younger individual age 45-49 | High school graduate or more. | Skilled or semi-skilled – skills not transferrable | Not disabled. |
| 201.22 | Younger individual age 45-49 | High school graduate or more. | Skilled or semi-skilled – skills transferrable | Not disabled. |

Strictly applying these rules, ALJ Wexler determined that the Plaintiff was not disabled.

However, in the Court's view, her conclusion is erroneous because she plainly failed to recognize that the Plaintiff was within three months of a higher age classification. At a minimum, this circumstance obligated the ALJ to progress to the second question of the two-part test and determine whether using the higher age category, namely, the "person closely approaching advanced age" category, would result in a decision of disabled. As the Grids make clear, there is a distinct possibility that the answer to this question may have been "yes":

| Rule | Age | Education | Previous Work Experience | Decision |
|------|-----|-----------|--------------------------|----------|
| *201.14* | *Closely approaching advanced age* | *High school graduate or more – does not provide for direct entry into skilled work.* | *Skilled or semi-skilled – skills not transferrable* | *Disabled* |
| 201.15 | Closely approaching advanced age | High school graduate or more – does not provide for direct entry into skilled work. | Skilled or semi-skilled – skills transferrable | Not disabled. |
| 201.16 | Closely approaching advanced age | High school graduate or more – provides for direct entry into skilled work. | Skilled or semi-skilled – skills not transferrable | Not disabled. |

(emphasis supplied).

Accordingly, the ALJ was required to undertake a further analysis to decide which age classification to ultimately use, and her failure to do so constitutes reversible error.   See, e.g. Souliere, 2015 U.S. Dist. LEXIS 1246, at *14 (reversing an ALJ's decision that failed to recognize a borderline age situation where the claimant was one month away from qualifying for an older age classification; noting that "this Court and others have held that six months is within the rule"); see also Jerome v. Astrue, 08-cv-98, 2009 U.S. Dist. LEXIS 104374 (D. Vt. Nov. 6, 2009) ("Although the ALJ noted that Jerome was 48 years old on the alleged disability onset date, the decision does not mention or evaluate the fact that Jerome was 50 years old when the administrative hearing took place and when the ALJ decision was issued, and more importantly, only approximately one week shy of being 50 years old on the [date last insured]"); Metaxotos, 2005 U.S. Dist. LEXIS 26463, at *22-*23 (noting that the relevant regulations "do not clearly define when a borderline situation exists" but that "[s]ome courts which have addressed this regulation have held that six months is within the rule").

Based on the foregoing, the Court finds that a remand for further administrative proceedings is appropriate. In particular, in light of the borderline age situation presented, the ALJ must determine whether, under the circumstances, it is appropriate to utilize the "younger individual age 45-49" classification or the "person closely approaching advanced age" classification. In doing so, the ALJ is instructed to utilize the analytical framework developed by the courts in this Circuit. See, e.g., id. at *21; see also Torres v. Comm'r of Soc. Sec., 14-cv-6438, 2015 U.S. Dist. LEXIS 123237, at *25-*26 (W.D.N.Y. Sept. 15, 2015).

Further, as the Grids make clear, even if the ALJ utilizes the higher age classification, namely, "person closely approaching advanced age," the Plaintiff will only be found to be disabled if the ALJ determines that the job skills he possesses are not transferrable to other kinds of work. At the initial hearing, ALJ Wexler declined to make any specific findings regarding the transferability of the Plaintiff's job skills. Thus, on remand, the Court requests that she make an explicit determination on that issue to allow for meaningful review of her ultimate decision, if necessary.

## III. Conclusion

Based on the foregoing, it is hereby

**Ordered**, that the Plaintiff's cross-motion for judgment on the pleadings is granted in part and denied in part; and it is further

**Ordered**, that the Commissioner's motion for judgment on the pleadings is granted in part and denied in part; and it is further

**Ordered**, that the February 5, 2013 decision of the ALJ is vacated to the limited extent that it found the Plaintiff not disabled without addressing the borderline age situation; and it is further

**Ordered**, that the February 5, 2013 decision of the ALJ is affirmed in all other respects; and it is further

**Ordered** that this case is remanded to the ALJ for another hearing consistent with this Memorandum of Decision and Order; and it is further

**Ordered**, that the Clerk of the Court is directed to close this case.

**SO ORDERED**

Dated:      Central Islip, New York     */s/ Arthur D. Spatt*
                  January 15, 2016          ARTHUR D. SPATT
                                       United States District Judge